UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WHITNEY TAYLOR,<br><br>            Plaintiff,<br><br>   vs.<br><br>ASTRONOVA, INC., DARIUS G. NEVIN,<br>JORIK E. ITTMANN, SHAWN KRAVETZ,<br>ALEXIS P. MICHAS, MITCHELL I. QUAIN,<br>YVONNE E. SCHLAEPPI, and RICHARD S.<br>WARZALA<br><br>            Defendants. | Case No. 26-cv-8791 |

**COMPLAINT**

Plaintiff Whitney Taylor ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against AstroNova, Inc. ("AstroNova" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Catalyst, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of AstroNova by Arcline Investment Management L.P.'s ("Arcline") affiliate Orion Merger Parent, Inc. ("Orion Merger Parent"), and Orion Merger Parent's wholly controlled

1

subsidiary Orion MergerCo X, Inc. ("Merger Sub"), an entity formed for the sole purpose of facilitating the present transaction (together with Arcline and Orion Merger Parent, "Arcline").

2. On or about June 17, 2026, AstroNova entered into an agreement and plan of merger (the "Merger Agreement"), whereby Arcline will acquire AstroNova (the "Proposed Transaction") and shareholders of Catalyst common stock will receive $29.00 in cash for each share of each share of AstroNova common stock they own (the "Merger Consideration").

3. On or about July 16, 2026, in order to convince AstroNova shareholders to support the Proposed Transaction, the Board authorized the filing of a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") with the SEC. As detailed below, the Proxy Statement is materially incomplete and misleading.

4. The special meeting at which AstroNova shareholders will cast their votes on the Proposed Transaction (the "Special Meeting") will be scheduled and the Proxy Statement that will be used to solicit votes on the Proposed Transaction will be sent to AstroNova shareholders shortly. It is imperative that the material information that has been omitted from the Proxy Statement be disclosed immediately so public stockholders may have time to consider the information that has been omitted and misrepresented and make a fully and fairly informed determination as to how to vote.

5. For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction, unless and until the material information discussed below is disclosed to AstroNova shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.       This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7.       Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

8.       Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2) because Defendants are subject to personal jurisdiction in this District, AstroNova's financial advisors maintain offices in this District, and shareholders of AstroNova reside in this District so Defendants were aware that the Proxy Statement would be reviewed in this District. *Santore v. Swaminathan*, No. 17 cv 5742, 2018 U.S. Dist. LEXIS 33352, at *23 (N.D. Ill. Mar. 1, 2018) ("the standard for establishing venue under [the Exchange Act] is not a rigorous one") (quoting *Haskett v. Reliv' Int'l.*, No 94 c 1461, 1994 U.S. Dist. LEXIS 5678, at *6 (N.D. Ill. Apr. 29, 1994)); *see also City of Miami Gen. Emples. & Sanitation Emples. Ret. Trust v. Casey*, No. 22-cv-2371, 2023 U.S. Dist. LEXIS 239991, at *4 (S.D. Ohio Mar. 27, 2023) ("The rule for establishing venue under the Securities Exchange Act is more permissive than under

3

28 U.S.C. § 1391, consistent with the intent of the venue and jurisdiction provision in the securities laws 'to grant potential plaintiffs liberal choice in their selection of a forum.'") (quoting *Wayne Cnty. Emples.' Ret. Sys. v. MIC Inv. Corp.*, 604 F. Supp. 2d 969, 973 (E.D. Mich. 2009)). Further, Defendants were aware that the Proxy Statement would be reviewed in this District. *See Sarantakis v. Gruttadauria*, No. 02 c 1609, 2003 U.S. Dist. LEXIS 4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district."); *see also Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in the Wall Street Journal and was read and relied upon by the plaintiff in Salt Lake City, Utah).

## PARTIES

9. Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of AstroNova common stock.

10. Defendant AstroNova is a publicly traded company incorporated in the state of Rhode Island. AstroNova designs, manufactures, distributes, and services solutions for customers to identify, track, and communicate through labeling and packaging services. AstroNova's common stock trades on the Nasdaq Stock Market (the "Nasdaq") under the ticker symbol "ALOT."

11. Defendant Darius G. Nevin ("Nevin") is AstroNova's Chairman of the Board.

12. Defendant Jorik E. Ittmann ("Ittmann") is the President, CEO, and director of the Company.

4

13. Defendant Shawn Kravetz ("Kravetz") is a director of the Company.

14. Defendant Alexis P. Michas ("Michas") is a director of the Company.

15. Defendant Mitchell I. Quain ("Quain") is a director of the Company.

16. Defendant Yvonne E. Schlaeppi ("Schlaeppi") is a director of the Company.

17. Defendant Richard S. Warzala ("Warzala") is a director of the Company.

18. The defendants identified in paragraphs 11 through 17 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Proposed Transaction

19. In September 2025, Company A submitted an indication of interest to acquire AstroNova.

20. On October 12, 2025, the Company engaged Rockefeller Capital Management ("Rockefeller") to assist to evaluating a potential transaction with Company A.

21. On November 6, 2025, the Company and Company A entered into exclusivity for a period of 45 days.

22. On January 23, 2026, the Company ceased negotiations with Company A. The Company, however, continued its retention of Rockefeller to explore strategic alternatives.

23. One of the Company's primary contacts at Rockefeller was James A. Ratigan ("Ratigan"). Sometime before March 2026, Ratigan left Rockefeller and joined Seabrook Partners LLC ("Seabrook Partners"). On March 12, 2026, the Company entered into a confidentiality and engagement agreement with Ratigan and Seabrook Partners to also work on the Company's consideration of strategic alternatives.

24. During April 2026, the Company engaged in a strategic alternatives review process

5

and its advisors reached out to potential parties for a strategic transaction.

25.    On May 12, 2026, Seabrook and Rockefeller began communicating with Arcline. On May 14, 2026, the Company and Arcline entered into a confidentiality agreement.

26.    On June 2, 2026, the Company received all-cash proposals from five potential acquirors. Among the potential acquirors, Arcline proposed to acquire the Company for $25.00 per share in cash and Company D proposed to acquire the Company for $24.50 in cash.

27.    On June 4, 2026, the Company narrowed potential pool of acquirors to Arcline and Company D.

28.    On June 6, 2026, the Company's legal counsel shared drafts of a merger agreement with each of Arcline and Company D.

29.    On June 15, 2026, the Company asked Seabrook to follow-up with Arcline and Company D. Arcline delivered a revised proposal to acquire the Company for $26.00 and Company D proposed to acquire the Company for $25.50.

30.    On June 16, 2026, on behalf of the Company, Seabrook submitted a counter offer of $27.00 to Arcline. Seabrook also informed Company D of the Company's intention to proceed with a transaction with Arcline. Thereafter, Company D delivered a revised proposal to acquire the Company for $27.50 per share.

31.    At the close of the markets on June 16, 2026, Arcline updated its proposal and increased their proposed purchase price to $29.00 per share.

32.    On the evening of June 16, 2026, the Board, in consultation with Seabrook and Rockefeller, determined that Arcline's proposal represented the best offer.

33.    On June 17, 2026, the Company and Arcline executed the Merger Agreement.

**B.**    **The Proposed Transaction and the Issuance of the Materially Incomplete and Misleading Proxy Statement**

34.     On or about June 17, 2026, AstroNova and Arcline issued a joint press release to announce the Proposed Transaction, stating in part:

### AstroNova to be Acquired by Arcline for $29.00 per Share in All Cash Transaction

WEST WARWICK, R.I.--(BUSINESS WIRE)-- AstroNova, Inc. (Nasdaq: ALOT), a leading provider of mission critical identification and marking solutions across the aerospace & defense and labeling & packaging industries, today announced that it has entered into a definitive agreement to be acquired by Arcline Investment Management ("Arcline"), a growth-oriented private equity firm, in an all-cash transaction with a total enterprise value of approximately $272 million; AstroNova shareholders will receive $29.00 per share in cash. Upon completion of the transaction, AstroNova will become a privately held company.

The transaction was unanimously approved by AstroNova's Board of Directors and follows the Company's previously announced review of strategic alternatives intended to maximize shareholder value. The per share purchase price represents a premium of approximately 209% over AstroNova's unaffected closing share price on April 6, 2026, the last full trading day prior to the strategic alternatives review announcement, and a premium of approximately 120% over the volume weighted average price (VWAP) of AstroNova common stock for the 90 days ending June 16, 2026.

**Transaction Terms**

The transaction requires approval by AstroNova stockholders and is expected to close in the third quarter of 2026, subject to customary closing conditions including receipt of regulatory approvals.

**Advisors**

Rockefeller Capital Management is serving as exclusive financial advisor to AstroNova and Foley Hoag LLP is serving as legal counsel. Alliance Advisors is serving as strategic communications advisor to AstroNova. Mesirow is serving as exclusive financial advisor to Arcline. Bass, Berry & Sims PLC is serving as Arcline's legal counsel.

7

35. On or about July 16, 2026, in order to solicit approval to consummate the Proposed Transaction from AstroNova's public shareholders, the Board authorized the filing of the Proxy Statement with the SEC.

36. The Proxy Statement is materially incomplete and misleading.

**C.     The Preclusive Deal Protection Devices**

37. The Merger Agreement contains onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

38. The Merger Agreement provides for a termination fee payable to Parent by the Company in the amount of $9,648,000 in the event the transaction is not consummated.

39. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

**D.     The Materially Incomplete and Misleading Proxy Statement**

40. The Proxy Statement is materially incomplete and misleading with respect to (i) Seabrook's role in the Proposed Transaction and the corresponding fees that Seabrook is entitled to; (ii) how unlevered free cash flow was calculated for the purposes of the DCF analysis; and (iii) why Rockefeller selected the date of June 8, 2026 as a metric that the Merger Consideration was compared to.

**i.     The Proxy Statement is Materially Incomplete and Misleading as to the Role of Seabrook in the Proposed Transaction**

41. The Proxy Statement is materially incomplete and misleading in failing to disclose whether Seabrook provided any services to the Company or Arcline in the past, Seabrook's role in

advising the Company with respect to the Proposed Transaction and fees paid or to be paid to Seabrook.

42.     The Proxy Statement disclosed the Company retained Rockefeller very early in the process:

> On October 14, 2025, the Company engaged Rockefeller as its investment banking firm to assist the Company with the evaluation and negotiation of the indication of interest received from Company A. Company A was advised by its own financial advisor in connection with the negotiation of its proposal.

Proxy Statement at 18

43.     However, following Ratigan's departure from Rockefeller and association with Seabrook Partners, "[o]n March 12, 2026, the Company entered into a Confidentiality and Engagement Agreement with James A. Ratigan and Seabrook Partners LLC ("**Seabrook**") to provide for Mr. Ratigan's continued work on the Company's consideration of strategic alternatives *following his departure from Rockefeller*." Proxy Statement at 19 (emphasis added).

44.     The Proxy Statement fails to disclose the terms of the "Confidentiality and Engagement Agreement" with Ratigan or Seabrook and what role Ratigan or Seabrook had with respect to the Proposed Transaction. Such information is especially material because Seabrook, as opposed to Rockefeller or any of the Company's other advisors, appears to have been at the forefront of actively negotiating key terms of the merger agreement and merger consideration with Arcline and other parties during the lead up to the Proposed Transaction.

45.     For example, after the Company conducted outreach to potential strategic partners, "Company F" spoke directly with a "representative of Seabrook" instead of a representative of Rockefeller or the Company:

> On June 2, 2026, the Company received revised all-cash proposals from five potential acquirors: Arcline at a price of $25.00 per share, Company B at a price of $21.70 per share, Company C at a price of $24.00 per share, Company D at a price

> of $24.50 per share, and Company E at a price of $22.00 per share. Each of Arcline, Company B and Company E accompanied their proposals with a mark-up of the draft Merger Agreement prepared by Foley Hoag, while Company C and Company D provided an issues list describing their areas of concern in the draft Merger Agreement. Another potential acquiror, Company F, ***verbally expressed to a representative of Seabrook*** its continued interest in acquiring the Company and indicated that it could improve on its prior valuation, but likely not to a competitive level. Company F never submitted a revised proposal in writing

Proxy Statement at 21 (emphasis added)

46. Seabrook was further responsible for presenting the "financial terms" of the revised proposals from June 2, 2026 which influenced the Board's decision to negotiate with Arcline as opposed to other potential strategic partners:

> On June 3, 2026, the Board met with senior management, representatives of Seabrook, Rockefeller and Foley Hoag to review the revised proposals. ***A representative of Seabrook described the financial terms of the revised proposals***, and a representative of Foley Hoag described the material issues raised in the mark-ups of the Merger Agreement and issues lists provided by the bidders. ***After reviewing the revised bids with Seabrook***, Rockefeller and Foley Hoag, and taking into account the price, certainty, and other terms reflected in the proposals, the ***Board determined to continue the process only with Arcline and Company D***.

Proxy Statement at 21 (emphasis added).

47. Thereafter, the Proxy Statement indicates that Seabrook acted as the primary intermediary between the Board and Arcline and the Company when discussing and negotiating material elements such as the merger consideration, timing, and exclusivity:

> On June 4, 2026, at the direction of the Company, ***a representative of Seabrook communicated to both Mr. Venkatasubramanian [Arcline representative] and a representative of Company D*** that the Company intended to narrow the process to two parties, that the proposals from Arcline and Company D were competitive in price, and that the Board was focused on pushing to a signed and announced transaction by the middle of June. ***The representative of Seabrook informed the representative of Company D that the Board would not grant exclusivity*** to Company D. The representative of Seabrook further advised the representative of Company D that if Company D wished to remain competitive, it should provide a revised draft of the Merger Agreement to the Company as soon as possible. Mr. Venkatasubramanian and other Arcline representatives delivered a confirmatory

10

diligence roadmap to Seabrook and Rockefeller the same day and committed to a June 15 target signing date.

Proxy Statement at 21.

48.     In fact, while the Company was negotiating solely with Arcline a day before the announcement of the Proposed Transaction, Nik Venkatasubramanian ("Venkatasubramanian"), who was the principal representative of Arcline's investment team, spoke directly and exclusively with a "representative" of Seabrook:

> Following the close of the markets in the afternoon of June 16, 2026, *Mr. Venkatasubramanian and the representative of Seabrook spoke by telephone, and Mr. Venkatasubramanian advised the representative of Seabrook that Arcline was prepared to submit an improved offer, in writing, subject to the Board being promptly convened to consider the offer and the final Merger Agreement.* Mr. Venkatasubramanian asked for further assurance that AstroNova would not communicate the terms of the offer to Company D. Arcline delivered to Darius Nevin, the Chairman of the Board, Jorik Ittmann, the Company's Chief Executive Officer, and the representative of Seabrook an updated proposal addressed to the Board pursuant to which it increased its proposed price to acquire the Company from $27.25 per share to $29.00 per share

Proxy Statement at 24 (emphasis added)

49.     Notwithstanding these repeated activities of Seabrook, Proxy Statement fails to identify the Seabrook representative involved in the negotiations, the nature or scope of Seabrook's engagement, or the allocation of responsibilities between Rockefeller and Seabrook.

50.     The omitted information is especially material to the reasonable stockholder as Rockefeller is identified in the Merger Agreement as the Company's exclusive financial advisor entitled to fees:

> **Section 3.10 Brokers' and Finders' Fees.** Except for fees payable to Rockefeller Financial LLC (the "**Company Financial Advisor**") pursuant to an engagement letter listed in Section 3.10 of the Company Disclosure Letter (the "**Rockefeller Engagement Letter**"), a correct and complete copy of which has been provided to Parent, neither the Company nor any of its Subsidiaries has incurred, nor will it incur, directly or indirectly, any liability for investment banker, brokerage, or finders' fees or agents' commissions, or any similar charges in connection with this Agreement or any transaction contemplated by this Agreement.

Proxy Statement at A-21

11

51.     This is consistent with the June 17, 2026 press release announcing the Proposed Transaction: "Rockefeller Capital Management is serving as *exclusive financial advisor* to AstroNova …" (Emphasis added.).

52.     As such, the Proxy Statement does not clarify the identity of the Seabrook representative who actively negotiated material terms of the Merger Agreement and merger consideration, what fees Seabrook is entitled to, and any past relationships Seabrook had with either the Company or Arcline. Without such information, stockholders are unable to fully evaluate the advisory process and its impact on the Proposed Transaction. *See City of Sarasota Firefighters' Pension Fund et al. v. Inovalon Holdings, Inc* 319 A.3d 271, 296 (Del. 2024) ("Similarly, in Rodden v. Bilodeau, the Court of Chancery held that it was reasonably conceivable that payments in the two years preceding the merger to its financial advisor totaling $9 million (consisting of $4.9 million by the target and $4.1 million by the acquirer) would be deemed material because disclosure of those payments would help the target's stockholders to 'contextualize the magnitude of the [financial advisor]'s conflict of interest.').

ii.     **The Proxy Statement is Materially Incomplete and Misleading as to how the unlevered free cash flow was calculated and used for the DCF Analysis**

53.     The Proxy Statement is materially incomplete and misleading as it does not clarify or disclose how Rockefeller derived the "after-tax unlevered free cash flows" in its DCF analysis.

54.     The Proxy Statement specifically details the methodology for calculating the "unlevered free cash flow": "Rockefeller performed each such analysis based on the Forecasts and the calculations of *after-tax unlevered free cash flows* with respect to each Segment set forth in the section entitled "*The Merger — Projected Financial Information*" beginning on page 38 of this proxy statement" (Proxy Statement at 36) (emphasis added).

55.     The Proxy Statement also provides the formula used for calculating "unlevered free cash flows":

(2)     Estimated unlevered free cash flow is calculated as estimated operating income *plus* estimated depreciation and amortization, *plus* estimated share-based compensation, *plus* any estimated decrease or *minus* any estimated increase in net working capital, *minus* estimated capital expenditures as follows:

Proxy Statement at 40

56.     However, while the formula for unlevered free cash flow deducts "estimated increase in net working capital" and "estimated capital expenditures," the formula fails to account for or make any deductions based on taxes. Nor does the Proxy Statement explain whether Rockefeller independently adjusted management's projected unlevered free cash flows to account for taxes before performing its valuation analysis.

57.     Additionally, the "financial projections" also do not account for tax-deductions or if such deductions were converted into the "after-tax" unlevered free cash flows that Rockefeller states it used in its DCF analysis:

(2) Estimated unlevered free cash flow is calculated as estimated operating income *plus* estimated depreciation and amortization, *plus* estimated share-based compensation, *plus* any estimated decrease or *minus* any estimated increase in net working capital, *minus* estimated capital expenditures as follows:

| | Fiscal year ended January 31, (in millions) | | | | |
|---|---|---|---|---|---|
| | 2027E | 2028E | 2029E | 2030E | 2031E |
| Operating income | $ 8.1 | $12.5 | $24.5 | $26.7 | $28.6 |
| Depreciation and amortization | $ 5.1 | $ 5.1 | $ 5.1 | $ 5.1 | $ 5.1 |
| Share-based compensation | $ 2.5 | $ 2.5 | $ 2.6 | $ 2.6 | $ 2.7 |
| Change in net working capital | $ 3.5 | $ — | $ 0.5 | $(1.8) | $(1.4) |
| Capital expenditures | $ 2.0 | $ 0.8 | $ 0.8 | $ 1.8 | $ 1.8 |
| Unlevered free cash flow | $17.2 | $19.3 | $31.8 | $30.8 | $33.2 |

| | Fiscal year ended January 31, (in millions) | | | | |
|---|---|---|---|---|---|
| | 2027E | 2028E | 2029E | 2030E | 2031E |
| Aerospace segment operating income | $12.7 | $16.0 | $18.3 | $19.8 | $21.2 |
| Depreciation and amortization | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.4 |
| Share-based compensation | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.3 |
| Change in net working capital | $ 2.1 | $ — | $(0.6) | $(0.2) | $(0.1) |
| Capital expenditures | $ 0.5 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 |
| Aerospace segment unlevered free cash flow | $15.9 | $17.4 | $19.1 | $21.0 | $22.5 |

| | Fiscal year ended January 31, (in millions) | | | | |
|---|---|---|---|---|---|
| | 2027E | 2028E | 2029E | 2030E | 2031E |
| Product Identification segment operating income | $ 3.5 | $ 4.7 | $14.5 | $15.5 | $16.3 |
| Depreciation and amortization | $ 3.7 | $ 3.7 | $ 3.7 | $ 3.7 | $ 3.7 |
| Share-based compensation | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 |
| Change in net working capital | $ 1.4 | $ — | $ 1.1 | $(1.6) | $(1.3) |
| Capital expenditures | $ 1.5 | $ 0.6 | $ 0.6 | $ 1.6 | $ 1.6 |
| Product Identification segment unlevered free cash flow | $ 7.5 | $ 8.2 | $19.2 | $16.5 | $17.5 |

40

| | Fiscal year ended January 31, (in millions) | | | | |
|---|---|---|---|---|---|
| | 2027E | 2028E | 2029E | 2030E | 2031E |
| Corporate Expense segment operating loss | $(8.0) | $(8.2) | $(8.3) | $(8.6) | $(8.8) |
| Depreciation and amortization | $— | $— | $— | $— | $— |
| Share-based compensation | $ 1.8 | $ 1.9 | $ 1.9 | $ 2.0 | $ 1.9 |
| Change in net working capital | $— | $— | $— | $— | $— |
| Capital expenditures | $— | $— | $— | $— | $— |
| Corporate Expense segment unlevered free cash flow | $(6.2) | $(6.3) | $(6.4) | $(6.6) | $(6.9) |

Proxy Statement at 40-41

58.     Such information concerning how the "after-tax" deductions were considered in Rockefeller's DCF valuation is clearly material to the reasonable stockholder. Without disclosure explaining whether Rockefeller applied tax adjustments to management's projected unlevered free cash flows—or, alternatively, why the disclosed calculations omit any tax deduction despite Rockefeller's repeated reference to "after-tax" unlevered free cash flows—stockholders cannot fully evaluate Rockefeller's valuation methodology or the fairness of the merger consideration.

**iii.     The Proxy Statement is Materially Incomplete and Misleading as to why certain dates were selected by Rockefeller in analyzing the Merger Consideration.**

59.     The Proxy Statement provides that Rockefeller analyzed and compared the Merger Consideration to the following events:

14

Rockefeller analyzed the Merger Consideration of $29.00 per share of Common Stock to be paid to holders of shares of Common Stock pursuant to the Merger Agreement in relation to:

- the closing price per share of Common Stock on April 6, 2026, the trading day prior to the issuance of AstroNova's press release announcing that the Board had initiated a review of strategic alternatives, of $9.40;

- the volume weighted average price ("VWAP") per share of Common Stock for the 90-trading-day period ended April 6, 2026 of $8.74;

- the closing price per share of Common Stock on June 8, 2026 of $15.68;

- the highest closing price per share of Common Stock during the 52-week period ended April 6, 2026 of $12.47; and

- the lowest closing price per share of Common Stock during the 52-week period ended April 6, 2026 of $7.01.

Rockefeller's analysis observed that the price per share of Common Stock to be paid to the holders of shares of Common Stock pursuant to the Merger Agreement represented:

- a premium of 208.5% based on the closing price per share of Common Stock on April 6, 2026;

30

Table of Contents

- a premium of 231.9% based on the VWAP per share of Common Stock for the 90-trading-day period ended April 6, 2026; and

- a premium of 84.9% based on the closing price per share of Common Stock on June 8, 2026.

Proxy Statement at 29-30

60. In contrast to the April 6, 2026 date that corresponds to major transaction events such as the closing price per share prior to the Company's press release announcing the Board's review of strategic alternatives, the Proxy Statement provides no explanation concerning the economic context or significance of the June 8, 2026 benchmark.

61. By June 8, 2026, the Company had publicly announced its strategic alternatives process, released its quarterly financial results, and actively engaged in an active sales process involving several different potential acquirors. As such, the Proxy Statement does not disclose or explain how stockholders should interpret the June 8, 2026 benchmark in comparing and evaluating the Merger Consideration.

62. Information concerning the June 8, 2026 benchmark is material to the reasonable stockholder. Rockefeller's analysis relies on June 8, 2026 trading price to calculate an implied merger premium of approximately 84.9%. Without disclosure explaining the economic significance of that benchmark and the information already incorporated into the Company's market price by

15

June 8, 2026, stockholders cannot reasonably evaluate the significance of the premium analysis presented by Rockefeller.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

63. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

64. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

65. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

66. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

67. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the misleading Proxy, which attempts to minimize the number of shares voting against the Proposed Transaction.

68. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

69. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

70. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligent, recklessness, or intentional conduct.

71. The Company is also deemed negligent, reckless, or intentional as a result of the Individual Defendants' intent in preparing and reviewing the Proxy.

17

72. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

73. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

74. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

75. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous

18

recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

77.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

78.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

79.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

80.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies in the Proxy Statement;

19

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 23, 2026                                    **ADEMI LLP**

By:     */s/ John D. Blythin*
        Guri Ademi (WI 1021729)
        John D. Blythin (IL 6281648)
        3620 East Layton Avenue
        Cudahy, Wisconsin 53110
        Tel. 414-482-8000
        Fax 414-482-8001
        gademi@ademilaw.com
        jblythin@ademilaw.com

        *Attorneys for Plaintiff*

20